# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAULINE M. BAILEY,** | : | **No. 3:13cv3006** |
| **Administrator of the Estate of Wesley** | : | |
| **Sherwood, Jr.,** | : | **(Judge Munley)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **B.S. QUARRIES, INC.; DAMASCUS 535** | : | |
| **QUARRY AND STONE PRODUCTS, LLC.;** | : | |
| **TNT ONE LIMITED PARTNERSHIP; TNT** | : | |
| **SERVICES CORP.; LIPPMANN** | : | |
| **MILWAUKEE, INC.; LIPPMANN QUALITY** | : | |
| **USED EQUIPMENT; VIRA CORPORATION** | : | |
| **TIMOTHY SMITH; and/or THOMAS** | : | |
| **BOLLES,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Twenty-two year old Wesley Sherwood died in December 2011 in an accident at a quarry while operating a rock crusher.  His estate brought suit against the companies and individuals who owned and operated the quarry and crushing concern, as well as the landowner and the manufacturer of the machine that killed him.  After months of contentious discovery, this case is far from resolved, and must proceed to trial.

Before the court for disposition are six cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Docs. 105, 107, 109, 111, 116, 118).  These motions are fully briefed and ripe for decision.

For the reasons stated below, the court will grant in part and deny in part the parties' motions.

**Background[1]**

This case arises from Wesley Sherwood's accidental death at the Lanesboro Quarry in Susquehanna County, Pennsylvania on December 15, 2011.  (Doc. 129, B.S. Quarries Defs.' Statement of Facts (hereinafter "SOF") ¶ 1; Doc. 117, Lippmann Defs.' SOF ¶ 1; Doc. 118-3, Pl.'s SOF ¶ 1). Sherwood fell into a rock crusher manufactured by the Lippmann Defendants and died.  (B.S. Quarries Defs.' SOF ¶ 2; Lippmann Defs.' SOF ¶ 1; Doc. 128, Pl.'s Resp. ¶ 2).

**The Parties**

Wesley Sherwood, whose estate brought the instant suit, was twenty-two years old and worked as the operator of a rock crusher at the Lanesboro Quarry in Susquehanna County, Pennsylvania when he died.  (Doc. 129, B.S. Quarries Defs.' Am. SOF ¶ 1; Lippman Defs.' SOF ¶ 1; Doc. 128, Pl.'s Resp. ¶ 1).

---

[1]  For ease of reference we will adopt the parties' terminology and refer to Defendants B.S. Quarries, Inc., Damascus 535 Quarry and Stone Products, LLC, and TNT One Limited Partnership and TNT Services Corp. collectively as the "B.S. Quarries Defendants," and to Defendants Lippmann Milwaukee, Inc., Lippmann Quality Used Equipment, and Vira Corporation collectively as the "Lippmann Defendants."

Defendant B.S. Quarries owned and operated the Lanesboro Quarry at the time of the accident.  (Doc. 117-1, Mine Safety and Health Administration (hereinafter "MSHA") Report of Investigation (hereinafter "MSHA Report") at 3; Doc. 137, Pl.'s Ex. 34, Dep. of Thomas Bolles (hereinafter "Bolles Dep.") at 11).[2]  Defendant Damascus 535 owned and operated a portable crushing plant at the Quarry.  (MSHA Report at 3; Doc. 137, Pl.'s Ex. 35, Dep. of Timothy Smith (hereinafter "Smith Dep.") at 12).  Defendant TNT Limited Partnership owned the land on which the Quarry was located.  (Doc. 21, B.S. Quarries Defs.' Ans. ¶ 10;  Bolles Dep. at 11, 26).  Defendant TNT Services Corp. owned trucks and operated as a trucking company that provides quarry-related services.  (Bolles Dep. at 11).

Defendants Thomas Bolles and Timothy Smith owned all of these companies jointly, with the exception of Damascus 535, which Defendant

---

[2] The parties' briefs and statements of fact related to the instant motions–which are hardly models of clarity–fail to define the relationships and roles of all the corporate parties involved.  The court is unable to find this information in the complaint or any subsequent filing either.  We are forced to glean what we can from combing accompanying exhibits for facts to support or disprove the parties claims, and, we assume, where no party has provided evidence to the contrary or contested a particular assertion, that the facts therein can be relied upon as true.  In any event, these background facts merely provide context, and are not crucial to our decision on any of the instant motions.

3

Smith owned in its entirety.  (B.S. Quarries Defs.' Am. SOF ¶ 26; Bolles Dep. at 10-12; Smith Dep. at 10-14).   Defendant Smith was President and CEO of Damascus 535, and Defendant Bolles was Vice-President of B.S. Quarries. (B.S. Quarries Defs.' Am. SOF ¶ 17; Doc. 128, Pl.'s Resp. ¶ 17; Smith Dep. at 22-26).

The Lippmann Defendants manufactured and sold the rock crusher. (Lippman SOF ¶ 2; B.S. Quarries Defs.' Am. SOF ¶ 2; Doc. 128 ¶ 2).

**The Accident and Investigation**

Coworkers last saw Sherwood alive while he operated a rock crusher at the Quarry, and a short time later found him dead inside the machine.  (B.S. Quarries Defs.' Am. SOF ¶ 3).  Sherwood was pronounced dead at the scene. (Id. ¶ 10).  The apparent cause of death was blunt force trauma to the head. (Id.)  An autopsy conducted on December 16, 2011, found extensive head trauma, bilateral basilar skull hinge fracture, and other injuries.  (Id. ¶ 12).

After the accident, the United States Department of Labor Mine Safety and Health Administration conducted an investigation.  (MSHA Report; Doc. 117, Lippmann Defs.' SOF ¶ 4; Doc. 130, Pl.'s Resp. to Lippman Defs.' SOF ¶ 4).  MSHA found three root causes of the accident.  First, a "risk assessment was not conducted to identify potential hazards and establish

4

safe procedures prior to performing inspection, maintenance, or tasks such as clearing jammed material on the jaw crusher." (MSHA Report at 4). Second, "[m]anagement failed to ensure policies and procedures were in place to safely perform maintenance or other tasks on the jaw crusher." (Id.) MSHA based this finding on their conclusion that Sherwood "left the confines of the protective railing system on the platform to access the areas adjacent to the jaw feed opening. Safe access was not provided or maintained to safely access the area." (Id.) Third, "[m]anagement failed to provide adequate New Miner and Task Training to the victim regarding tasks such as clearing a jammed crusher." (Id.)

MSHA summarized their ultimate findings thusly:

> The accident occurred due to management's failure to establish policies and procedures ensuring the safety of persons performing work activities at or near the rock crusher. The jaw crusher was not de-energized, locked and tagged out, and blocked against motion prior to persons performing work around the feed opening. Management failed to establish procedures ensuring persons could safely access the feeder from the viewing platform or from ground level. To gain access to the feeder, Sherwood had to climb out from the protective railing system, on the provided platform, and cross the jaw feed opening to reach the feeder deck. Additionally, Sherwood had 14 weeks of experience and did not receive training in accordance with 30 CFR Part 46.

(Id. at 5). As a result of the investigation, MSHA issued enforcement actions to Damascus 535 Quarry and Stone Products, LLC (hereinafter "Damascus

535").  (Id.)

The parties agree that Sherwood died while working within the course

and scope of his employment, but dispute whether he was employed by B.S.

Quarries, Inc. or Damascus 535.  (B.S. Quarries Defs.' SOF ¶ 21; Doc. 128,

Pl.'s Resp. ¶ 21).

### Procedural Posture

Based upon these facts, plaintiff brought suit on December 16, 2013,

alleging: Count I, negligence against the B.S. Quarries Defendants; Count II,

products liability against the Lippmann Defendants; Count III, wrongful death

against all defendants; Count IV, survival action against all defendants and;

Count V, punitive damages against all defendants.  (Doc. 1).

On April 21, 2015, the B.S. Quarries Defendants filed four separate

motions for summary judgment (Docs. 105, 107, 109, 111), the Lippman

Defendants filed a single motion for summary judgment (Doc. 116), and

plaintiff filed her own motion for summary judgment (Doc. 118).  The issues

have been fully briefed, and the motions are ripe for consideration.

### Jurisdiction

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C.

§ 1332.  Plaintiff Pauline M. Bailey is a citizen of New York.  (Doc. 1, Compl.

6

¶ 1).  The B.S. Quarries Defendants, including B.S. Quarries, Inc., Damascus

535 Quarry and Stone Products, LLC[3], and TNT One Limited Partnership and

TNT Services Corp. (hereinafter, collectively, the "TNT Defendants") are

citizens of the State of Pennsylvania with their principal places of business in

Pennsylvania.  (Id. ¶¶ 7-12).  Defendants Timothy Smith and Thomas Bolles

are both citizens of Pennsylvania.  (Id. ¶¶14-15).  Defendants Lippmann

Milwaukee, Inc., Lippmann Quality Used Equipment, and Vira Corporation

(hereinafter, collectively, the "Lippmann Defendants") are citizens of

Wisconsin with their principal places of business in Wisconsin.  Additionally,

the amount in controversy exceeds $75,000.  Because complete diversity of

citizenship exists among the parties and the amount in controversy exceeds

$75,000, the court has jurisdiction over the case.  See 28 U.S.C. § 1332

("district courts shall have original jurisdiction of all civil actions where the

---

[3] Plaintiff's pleadings as to defendants' citizenship for purposes of
jurisdiction are less than complete.  Defendant Damascus 535, LLC is
designated as a limited liability company ("LLC").  Federal courts look to the
citizenship of the LLC's members when determining the jurisdictional
citizenship of a LLC.  See Zambelli Fireworks Mfg. Co. Inc. v. Wood, 592 F.3d
412, 418 (3d Cir. 2010); see also Carden v. Arkoma Assocs., 494 U.S. 185,
195-96 (1990) (adhering to the "oft-repeated rule that diversity jurisdiction in a
suit by or against [an unincorporated] entity depends on the citizenship of 'all
the members.'" (quoting Chapman v. Barney, 129 U.S. 677, 682 (1889))).
The only members of Damscus 535 are Defendants Smith and Bolles, both
Pennsylvania citizens.  Thus Damascus 535 is a citizen of Pennsylvania.

matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]").   As a federal court sitting in diversity, the substantive law of Pennsylvania applies to the instant case.  Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

 In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).

8

The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  A fact is material if it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by establishing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts with affidavits, depositions, admissions, or answers to interrogatories demonstrating that there is a genuine issue for trial.  Id. at 324.

**Discussion**

All parties have moved for summary judgment on various grounds. Collectively, the defendants seek summary judgment on all counts within plaintiff's complaint.  Plaintiff moves for partial summary judgment on various issues.  Because the individual motions for summary judgment contain similar legal issues, the court will address them as follows: 1) Sherwood's employer; 2) piercing the corporate veil; 3) negligence issues; 4) punitive damages; 5)

the Lippmann defendants' failure to warn; and 6) the affirmative defenses of assumption of risk and contributory negligence.  The court will examine each of these issues in turn.

## I.    Sherwood's Employer

First, Defendant Damascus 535 and plaintiff both move for summary judgment on the question of whether Wesley Sherwood was employed by Damascus 535.  Damascus 535 argues that it employed Wesley Sherwood, and seeks to invoke immunity from this suit under Pennsylvania's Workers' Compensation Act.[4]  Plaintiff argues that B.S. Quarries, not Damascus 535, employed Sherwood, and that she dismissed a previous lawsuit in reliance on B.S. Quarries's attestation to that effect.  Plaintiff essentially asserts that B.S. Quarries and Damascus 535 (and their common owners) are attempting to shift immunity protection to Damascus 535 because the MSHA found Damascus 535 to be at fault for the accident that killed Wesley Sherwood and B.S. Quarries has declared bankruptcy.

To determine Sherwood's employer, Damascus 535 urges the court to apply a "control" test articulated in <u>Venezia v. Philadelphia Electric Company</u>,

---

[4] Damascus 535 contends that civil damages are unavailable from an employer of an injured employee under 77 PA. STAT. ANN. § 481(a), a contention that Plaintiff does not dispute.

177 A. 25 (Pa. 1935).  The <u>Venezia</u> test looks to whether an employee was subject to the purported employer's control with regard to the work to be done and the manner of performing it.  <u>Id.</u> at 26.  <u>Venezia</u> makes clear that "[t]he payment of wages is not a decisive factor."  <u>Id.</u>

Damascus 535 asserts four facts to establish its status as Wesley Sherwood's employer: 1) Damascus 535 paid Sherwood; 2) Damascus 535 withheld federal income tax from Sherwood's pay; 3) Damascus 535 owned the crushing machine Sherwood died in; and 4) Sherwood worked under the supervision of Damascus 535 employees Chad Fotusky and Randy Walker.

Under defendant's own test, payment is not dispositive, so the first fact is relevant, but not sufficient.  Additionally, the second fact, the withholding of income tax from Sherwood's paycheck, is simply a corollary of the first.  Third, that Damascus 535 owned the crushing machine does support a finding that Sherwood worked for the benefit of Damascus 535.  The machine, however, was located on land owned by the TNT defendants at a quarry operated by B.S. Quarries, and these circumstances muddy the waters significantly.  As discussed below, the real parties in interest in all these companies are Defendants Smith and Bolles, who owned the crusher, the land, and the quarry; that one corporate entity held the crusher on their behalf as opposed

11

to another is not particularly persuasive.

Finally, we come to the issue of Sherwood's supervisor.  Initially, Damascus 535 cites no evidence that its employee Walker supervised Sherwood.  As for Fotusky, Damascus did cite to testimony that he supervised Damascus 535 employees generally, that he had hired Sherwood and sometime later assigned him to work "with" Walker, but nowhere in the cited testimony does Fotusky claim to have been Sherwood's immediate supervisor, nor does he describe Walker as such.  (Defs.' Am. SOF ¶ 6; Doc. 137, Pl.'s Ex. 36, Dep. of Chad Fotusky at 198, 200-05).[5]

Clearly, even before we consider any evidence plaintiff has presented to counter Damascus 535's argument, defendant has, all on its own, failed to meet its burden under <u>Venezia</u>'s control test to establish that no material factual issues exist with respect to the identity of Sherwood's employer. Defendant utterly fails to even remotely approach passing its own proposed

_____

[5] In fact, Fotusky's testimony generally undermines defendant's position. At various points in his testimony, he claims Jay Molyneaux was a B.S. Quarries employee but acted as safety director for Damascus 535 (Fotusky Dep. at 198), states that he hired Joshua Hartman but seemed unsure whether he worked for Damascus 535 (<u>Id.</u> at 199 ("As far as I know Josh worked for Damascus.")), and testified that he himself had worked for B.S. Quarries at one point until some time after 2004, though he was unsure of the year (<u>Id.</u> at 19).  Such evidence belies the claim of clear lines of demarcation between B.S. Quarries and Damascus 535 where employees are concerned.

test, offering no clear evidence of control of Sherwood's work activities.

Based solely on defendant's deficient submission, we would deny this motion.

Defendant does, however, make one point with which we agree.  "This issue

is ripe and appropriate for summary judgment, and is not an issue that should

be put to the jury for determination as the available Workers' Compensation

immunity is a question of law." (Doc. 110, Damascus 535's Br. at 5).

Plaintiff argues that the record supports a finding that B.S. Quarries

employed Sherwood, pointing to the following: Sherwood's new-hire

paperwork, including a list of Policies and Procedures, a Conditional Offer of

Employment, and two HIPAA forms, all indicated Sherwood would be working

for B.S. Quarries (Pl.'s SOF ¶¶ 5-7; Doc. 118-1, Pl.'s Br. Ex. A at 266-71);

B.S. Quarries, through their insurance carrier, paid Sherwood's worker's

compensation death benefit, and, as of August 25, 2014, still sought

subrogation; (Pl.'s SOF ¶¶ 3-4; Doc. 118-1 at 273; Doc. 123, B.S. Quarries

Defs.' Resp. to Pl.'s SOF ¶ 4); B.S. Quarries Office Manager Lynn Bolles

called Travellers Insurance Company, its liability insurance carrier,

immediately after Sherwood's death to inform them of the accident, that

Sherwood was a direct hire employee of B.S. Quarries, and that she had

given his full employment records to the medical examiner (Pl.'s SOF ¶ 2;

13

Doc. 118-1, Pl.'s Br. Ex. A at 263-64; Doc. 123, B.S. Quarries Defs.' Resp. to Pl.'s SOF ¶ 2).

Finally, when plaintiff filed suit against B.S. Quarries in July 2013 in Lackawanna County Court, B.S. Quarries, through an attorney, urged that the state court action should be dismissed, citing the death benefit paid by B.S. Quarries and asserting immunity under worker's compensation law.  (Pl.'s SOF ¶ 8; Doc. 118-1, Pl.'s Br. Ex. A at 252-60).  Defendant Smith, in his capacity as President of B.S. Quarries, signed an affidavit to that effect, stating unequivocally that on the day he died, Sherwood was an employee of B.S. Quarries, and that he received his "fatal injuries in the course and scope of his employment with B.S. Quarries, Inc."  (Doc. 118-1, Pl.'s Br. Ex. A at 260).  Relying on this representation, plaintiff withdrew that lawsuit.  (Doc. 118-2, Pl.'s Br. at 3).

In the face of this evidence, Defendant B.S. Quarries does not contest that it induced plaintiff to dismiss her lawsuit by asserting immunity as Sherwood's employer, nor that plaintiff did, in fact, withdraw that suit.  (Pl.'s SOF ¶ 8; Doc. 118-1, Pl.'s Br. Ex. A at 252-60; Doc. 123, B.S. Quarries Defs.' Resp. to Pl.'s SOF ¶ 8).  Instead, in the instant litigation, Plaintiff Smith testified that the affidavit, which he signed and which attested that Sherwood

14

worked for B.S. Quarries, was not accurate and he had not read the document before signing.  (Doc. 123, B.S. Quarries Defs.' Resp. to Pl.'s SOF ¶ 8).

B.S. Quarries also acknowledges that its insurance carrier, Rockwood Casualty Insurance Co. did initially pay Sherwood's death benefit, but submits that New York State Insurance Fund, Damascus 535's carrier, more recently reimbursed Rockwood for that payment.  (Id.¶ 3).  Finally, the B.S. Quarries defendants concede the authenticity of the new-hire paperwork with the name B.S. Quarries on them, but dismiss the relevance of those documents because, they claim, they were forms "used with respect to other entities including Damascus 535[.]"  (Id. ¶¶ 5-6).

Defendant Damascus 535 also challenges plaintiff's contention that Sherwood worked for B.S. Quarries.  Specifically, Damascus 535 urges the court to instead rely upon other documents indicating Sherwood worked for Damascus 535, namely workers' compensation documents, a New Hire Checklist (Doc. 109-2), a Personal Information Form, tax documents (Doc. 109-5), and payroll documents (Doc. 109-3).  Damascus 535 also submits an injury report describing Sherwood's accident that bears the date November 20, 2013, and which, in contrast to the contemporaneous evidence above,

was plainly created long after Sherwood died on December 15, 2011.  (Doc. 109-1, Injury Report dated Dec. 15, 2011).

The record evidence makes manifestly clear that myriad genuine issues of material fact exist regarding which company employed Wesley Sherwood. On these grounds, both parties' motions would meet denial.  Plaintiff, however, urges an alternative theory, that Defendant Damascus 535 should be estopped from claiming to have employed Sherwood on equitable grounds.

In considering whether estoppel is appropriate here, the court is struck primarily by the undisputed fact that plaintiff dismissed a previous lawsuit based on the affidavit signed by Defendant Tim Smith attesting that Sherwood worked for B.S. Quarries.  Further, Damscus 535 remained silent at that time, and did not speak up to claim employer status until twenty months after Sherwood's death, when they were sued in this court.  Defendants' actions constitute the exact circumstances for which equitable estoppel exists.[6]

"The doctrine of equitable estoppel under Pennsylvania law 'arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces

---

[6] Plaintiff's brief raises a claim of collateral estoppel, a branch of the equitable remedy of estoppel that we do not directly address at this time.  The facts present a classic case for the application of equitable estoppel, and the factual foundation for that case are not in dispute.

another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.'" Mahakali Krupa, LLC v. Allstate Ins. Co., 619 F. App'x 98, 103 (3d Cir. 2015) (quoting In re Estate of Tallarico, 228 A.2d 736, 741 (Pa. 1967)).  Where the doctrine applies, "the person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements." Tallarico, 228 A.2d at 741.  "The elements of estoppel must be proven by clear and convincing evidence, with the critical elements being misrepresentation and justifiable reliance." Whiteco Metrocom v. Dep't of Transp., 616 A.2d 193, 195 (Pa. 1992).

The facts of the instant case satisfy every element of this doctrine. When plaintiff sued B.S. Quarries and B.S. Quarries asserted employer immunity, Damascus 535 failed to correct that assertion.  Thus, while B.S. Quarries expressly misrepresented themselves as Sherwood's employer by their statements, Damascus 535 made the same misrepresentation by their silence.  Damascus 535 clearly had notice that B.S. Quarries was claiming to have employed Sherwood, as Defendant Smith, who holds an ownership

17

interest in both companies, signed the affidavit himself.  Smith now claims that that affidavit misstated the truth, and he only signed it because he had not read it.  Even assuming this is true, the assertion was no less a misrepresentation for the lack of intent, and a negligent misrepresentation still warrants estoppel.  Tallarico, 228 A.2d at 741.

Having established a misrepresentation, plaintiff must next demonstrate she justifiably relied on defendants' misrepresentation.  Here, plaintiff did so to her detriment, withdrawing a lawsuit that she would otherwise have pursued.  B.S. Quarries reaped the benefits of claiming employer immunity through its misrepresentation, and Damascus 535 remained silent, allowing that misstatement to stand.  Defendants Smith and Bolles, who are, after all, the real parties in interest whenever we discuss any of the B.S. Quarries Defendants[7], also directly benefitted as a result.  Now, when plaintiff's suit arguably presents a greater threat to Damascus 535 than B.S. Quarries in light of the MSHA Report findings, defendants attempt to reshuffle the deck in order to deal themselves a stronger hand.  Plaintiff has already been prejudiced once when defendants misled her to withdraw a valid lawsuit, and she will suffer prejudice again if defendants are permitted to manipulate the

---

[7] See section II, infra.

18

shield of immunity to shelter whichever of their entities is at greatest risk.  And

finally, the integrity and policy interests of Pennsylvania law would be

subverted were we to allow this type of shell game to succeed.

We hold, therefore, that Defendant Damascus 535, and, in light of our

decision below to pierce the corporate veil, Defendants Smith and Bolles and

all their corporate alter egos, are estopped from asserting employer immunity

under the Pennsylvania Workers' Compensation Act.

## II.    Piercing the Veil

Next, Defendants Smith and Bolles seek summary judgment and

dismissal from this case on the basis that plaintiff has failed to establish any

grounds for individual liability.  All relevant conduct on the part of Smith and

Bolles, they contend, was within the scope and course of employment as

corporate officers for B.S. Quarries and/or Damascus 535.  Plaintiff responds

by asking the court to set aside the corporate forms of the various entities

involved and hold that Defendants Smith and Bolles are the real parties in

interest, liable for any negligence of the companies they own, under the

"piercing the corporate veil" doctrine.

Pennsylvania provides a strong presumption against piercing the

corporate veil.  Lumax Indus. v. Aultman, 669 A.2d 893, 895 (Pa. 1995) (citing

Wedner v. Unemp't Bd., 296 A.2d 792, 794 (Pa. 1972)).  Pursuant to

Pennsylvania law, "a corporation . . . is normally regarded as a legal entity

separate and distinct from its shareholders."  Ashley v. Ashley, 393 A.2d 637,

641 (Pa. 1978); see also Advanced Tele. Sys., Inc. v. Com-Net Prof'l Mobile

Radio, LLC, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004) (stating that "the

general rule is that a corporation shall be regarded as an independent entity

even if its stock is owned by one person"); Coll. Watercolor Grp., Inc. v. H.

Newbauer, Inc., 360 A.2d 200, 207 (Pa. 1976) (noting that a corporation with

a single shareholder can be an independent entity).

   "Nevertheless, 'a court will not hesitate to treat as identical the

corporation and the individuals owning all its stocks and assets whenever

justice and public policy demand and when the rights of innocent parties are

not prejudiced thereby nor the theory of corporate entity made useless.'"

Advanced Tele. Sys., Inc, 846 A.2d at 1278 (quoting Good v. Holstein, 787

A.2d 426, 430 (Pa. Super Ct. 2001)); see also Zubik v. Zubik, 384 F.2d 267,

272 (3d Cir. 1967) (stating that "the appropriate occasion for disregarding the

corporate existence occurs when the court must prevent fraud, illegality, or

injustice or when recognition of the corporate entity would defeat public policy

or shield someone from liability for a crime").  Here, plaintiff argues that the

court should impose liability on Defendants Smith and Bolles for the acts of the companies they own to prevent fraud.  Essentially, plaintiff contends that Defendants B.S. Quarries and Damascus 535 operate as Defendant Smith's and Defendant Bolles's alter egos.

Courts apply the alter ego doctrine to determine whether equity requires the piercing of the corporate veil.  The alter ego doctrine is "not applied by a test, but by consideration of relevant 'factors . . . [to determine] whether the debtor corporation is little more than a legal fiction.'"  Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003) (quoting Pearson, 247 F.3d at 485).  Pennsylvania courts typically consider the following factors: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud."  Lumax, 669 A.2d at 895 (citation omitted).  These factors are not exhaustive and, as a general rule, courts generally apply a "totality of the circumstances test."  Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co., 700 F. Supp. 2d 720, 737 (W.D. Pa. 2010) (citation omitted).

Defendants Smith and Bolles assert that plaintiff has not set forth any facts or evidence to establish that the corporate veil should be pierced.  Their

brief is short, conclusory, and entirely devoid of citations to the evidentiary record.  Additionally, defendants had the opportunity to file a reply brief to respond to the facts and arguments plaintiff set forth in favor of piercing the veil, but chose not to.  We are left with defendants' cursory assertion that plaintiff cannot carry her burden.

Plaintiff submits evidence that she argues satisfies the alter ego factors: 1) Damascus 535 is an LLC owned by Defendant Smith, and Smith is the sole corporate officer (Smith Dep. at 22-26); 2) B.S. Quarries is an S-type corporation owned in equal part by Defendants Smith and Bolles, and they serve as the only two corporate officers (Id.); 3) neither company holds regular corporate meetings, or keeps corporate minutes (Id.); 4) neither company elects officers (Id.); 5) B.S. Quarries was undercapitilized and has declared bankruptcy (Doc. 33 Suggestion of Bankruptcy); 6) B.S. Quarries has diverted all assets to another company owned by Defendant Smith, Ronald Opeil Flagstone Company, LLC, and continued operations in the same location with the same employees and equipment (Doc. 127-1, Pl.'s Br. Ex. 116 at 11-12, Ex. 38 Dep. of Cindy Hessey, Ex. 42 Dep. of Holly Haynes, Ex. 39 Dep. of Lynn Bolles).

Adding to the evidence amassed by plaintiff, the court notes three

further facts, established by evidence presented by both plaintiff and

defendants, in support of other aspects of the various motions before us.

First, the attempt to shuffle employer immunity from one entity to another

depending on which one faced the greater peril suggests that the owners

were ignoring the corporate forms and treating these companies as

something other than distinct and independent entities.  If each company

acted in its own best interests, B.S. Quarries should have opposed Damascus

535's assertion of employer status, but it did not.  Instead, the owners

evidently decided that Damascus 535, whom the MSHA concluded was at

fault in the accident, was in greater need of the shield than B.S. Quarries,

which has declared bankruptcy and transferred all assets to another

company.  This strongly supports plaintiff's fraud theory, as well as her alter

ego argument.

Second, when plaintiff submitted documents with B.S. Quarries's name

on them as evidence that Sherwood worked for that company, defendants

responded that those forms are used by multiple companies–further

demonstrating that the defendants do not adhere to corporate formalities.

Finally, Jay Moleneaux worked for B.S. Quarries as Safety Coordinator,

but served the same function for Damascus 535, despite testimony that the

two companies never share employees and that employees of one company never do work for the other.  (See Doc. 127-1, Pl.'s Br. Ex. 45 at 31-32; Pl.'s SOF ¶ 10; Doc. 123, B.S. Quarries Defs.' Resp. to Pl.'s SOF ¶ 10).  Further testimony establishes that other employees perform tasks for both companies as well.  (See Doc. 127-1, Pl.'s Br. Ex. 39 at 69-70).  Clearly, from the point of view of the B.S. Quarries Defendants, no actual distinction exists between the two companies.

Although plaintiff has not moved separately for summary judgment on this issue, the court can grant summary judgment to plaintiff *sua sponte* if it is warranted, and if defendants were on notice and had the opportunity to present relevant evidence.  See FED. R. CIV. P. 56(f); Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 280 (3d Cir. 2010).

"It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment sua sponte."  Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 222 (3d Cir. 2004), (citing Celotex Corp. v. Catrett, 477 U.S. at 326 ("Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.")).  "The court may not

enter judgment, however, without 'placing the adversarial party on notice that the court is considering a sua sponte summary judgment motion' and providing that party 'an opportunity to present relevant evidence in opposition to that motion.'"  Couden v. Duffy, 446 F.3d 483, 500 (3d Cir. 2006) (quoting Chambers Dev. Co. v. Passaic County Utils. Auth., 62 F.3d 582, 584 n.5 (3d Cir. 1995)); see also Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903, 910 (3d Cir. 1994).  Notice is satisfied if "the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward."  Gibson, 355 F.3d at 223-24 (internal quotation omitted).

Defendants raised this issue in their own summary judgment motion, so they had notice that they were to put their "best foot forward" by laying out their strongest case and presenting all of their evidence.  Defendants had ample opportunity to bring such evidence to the attention of the court in their brief and statement of facts, and have provided no evidence to counter plaintiff's.  In fact, as detailed above, much of the evidence that has convinced the court that piercing the veil is appropriate in this case was supplied by defendants themselves.  Finally, defendants had the opportunity to respond to plaintiff's arguments and evidence in a reply brief, and chose not to file one.

Accordingly, because we find that Defendants Smith and Bolles, and the corporate entities they own, Defendants B.S. Quarries and Damascus 535, have failed to adhere to corporate formalities, have undercapitalized these companies, and have intermingled the operations of the companies without regard for their distinct corporate identities, we hold that B.S. Quarries and Damascus 535 are merely alter egos of their owners, Timothy Smith and Thomas Bolles, and will *sua sponte* grant summary judgment in favor of the plaintiff on this point.[8]  Defendants Smith and Bolles remain as defendants in this matter in their individual capacities, and may be held personally liable if plaintiff prevails.  Defendants motion will be denied.

## III.   Negligence Issues

Having addressed the issues of Sherwood's employer and Defendant Smith's and Bolles's individual liability, the court next addresses defendants' challenges to plaintiff's negligence claims.

In Pennsylvania, a "prima facie negligence claim requires the plaintiff to show that: (1) the defendant had a duty to conform to a certain standard of

---

[8]  We note that plaintiff further argues that the evidence also satisfies the fraud element of the Lumax analysis.  We make no finding at this time of actual fraud in defendants' varying assertions of employer status in pursuit of immunity, though we recognize that a reasonable jury faced with this record could.  Even absent consideration of the fraud factor, however, the balancing test landed entirely on the side of piercing the veil.

26

conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage."  Krentz v. CONRAIL, 910 A.2d 20, 27 (Pa. 2006).

The TNT Defendants argue they owed Sherwood no duty of care that would beget liability under negligence law, and all defendants argue plaintiff cannot establish the element of causation.  We address these issues *in seriatim*.

## A.    TNT Defendants' Duty

The TNT Defendants seek dismissal of plaintiff's claims against them, arguing that plaintiff has failed to establish any duty they owed to Wesley Sherwood.  Plaintiff argues that the TNT Defendants owned the land on which the quarry was located, and therefore Sherwood was a business invitee at the time of his death and owed a commensurate duty of care.

In the context of Pennsylvania negligence law, "[a] business invitee is a person who is invited to enter or remain on the land of another for a purpose directly or indirectly connected with business dealings with the possessor of the land."  Gutteridge v. A.P. Green Servs., 804 A.2d 643, 656 (Pa. Super. Ct. 2002).  Pennsylvania law imposes a duty of care regarding business invitees:

> A possessor of land is subject to liability for physical harm caused
> to his invitees by a condition on the land if, but only if, he

27

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and(c) fails to exercise reasonable care to protect them against the danger.

Id.

The TNT Defendants argue, without citation to any record evidence, that no basis exists upon which plaintiff could establish that they owed a duty to Sherwood.  Sherwood had no affiliation with these two companies, defendants argue.  Plaintiff, however, presents the testimony of defendants' part-owner, Thomas Bolles, that TNT One Limited Partnership (hereinafter "TNT One") owns the real property upon which the quarry is located.  (Doc. 124-1, Pl.'s Br. Ex. 34 at 26).

Plaintiff has presented sufficient evidence to bring the question to the jury whether TNT One owned and possessed the land.  If she is successful, then she will have established the duty element of her negligence claim, the only element Defendant TNT One challenges in its motion.  Hence, Defendant TNT One's motion will be denied.

Plaintiff provides no such evidence, however, that TNT Services, Corp. owned the land or otherwise owed a duty of care to Wesley Sherwood.  In fact, the same deposition transcript cited by plaintiff to establish TNT One's

ownership, establishes that TNT Services, Corp. is in fact a trucking

company.  (Id. at 11).  Plaintiff has asserted no basis upon which a jury could

find that TNT Services, Corp. was at all involved in the events leading to

Wesley Sherwood's death, let alone the duty element of her claim.

Defendant TNT Services, Corp.'s motion for summary judgment will

therefore be granted, and it is dismissed from this case.  TNT One remains.

### B.    Causation

Next, we address causation.  The defendants all argue that plaintiff

cannot establish a causal link between any alleged negligence on the parts of

the B.S. Quarries Defendants or defect in the Lippmann crushing machine

and Sherwood's death.  Plaintiff counters that while no one witnessed

Sherwood's fall into the crusher, expert opinion testimony establishes the

necessary causal links.

Pertaining to causation, Pennsylvania has adopted the "substantial

factor" test as stated in the Restatement (Second) of Torts § 431, which

provides: "The actor's negligent conduct is a legal cause of harm to another if:

(a) his conduct is a substantial factor in bringing about the harm, and (b) there

is no rule of law relieving the actor from liability because of the manner in

which his negligence resulted in the harm."  Sherk v. Daisy-Heddon, Div. of

<u>Victor Comptometer Corp.</u>, 450 A.2d 615, 635 (Pa. 1982).

Defendants argue that plaintiff has submitted no evidence supporting causation.  Defendants characterize plaintiff's experts' testimony as conjecture lacking an evidentiary foundation.  Because no one witnessed Sherwood's fall, they argue, plaintiff simply cannot establish how and why he fell.

Plaintiff points out that the burden of proving that there exists no genuine issue as to any material fact rests on the defendants as the moving parties.  <u>Anderson</u>, 477 U.S. at 248.  Defendants have failed to carry this burden.  Defendants rightly point out that no witness saw Sherwood fall into the crusher, but the analysis does not end there.

Plaintiff's expert, biomechanical engineer Brian Benda, opines that the fall could have happened in one of only four possible ways: 1) a fall from the feeder side of the jaw crusher with Sherwood kneeling or crouched; 2) a lateral fall from the side structures of the crusher inlet as Sherwood tried to get to the feeder side if the inlet; 3) a forward fall while Sherwood stood on the feeder side of the crusher inlet trying to clear a jam with his foot; and 4) a backward fall into the jaw crusher inlet[9].  (Doc. 118-2, Pl's Br. Ex. 114 at 32-

---

[9] Due to the lack of injuries to the posterior side of Sherwood's body, Benda concludes that a backward fall scenario is the least likely possibility.

33).

Defendants argue that plaintiff's expert relies on conjecture and speculation, and not evidence, but do not contest any of Benda's specific conclusions.  Rather, defendants urge a blanket assertion that Benda's conclusions are not based on evidence.  Benda's report clearly purports otherwise, listing a plethora of record evidence from which he draws his expert opinions.[10]  Thus, genuine issues of material fact plainly exist as to the basis of plaintiff's expert's opinion on the nature and cause of Sherwood's fall.

Defendants further assert that Benda's conclusions cannot establish causation because he has merely stated several possible scenarios that explain Sherwood's fall.  This is an inaccurate assessment of Benda's methods and conclusions.

To be sure, Benda starts with the proposition that "any fall kinematic that is consistent with the laws of physics can be considered a 'possible'

_____

[10] Benda's analysis of the record evidence leads him to this conclusion. (Doc. 118-2, Pl's Br. Ex. 114 at 11-27).  Benda examined eight deposition transcripts, police reports from Lanesboro Department of Police and Pennsylvania State Police, MSHA report, excerpts from the Telsmith Mineral Processing Handbooks and the Lippmann Jaw Crushers Installation & Operation Manual (hereinafter the "Lippmann Manual"), the Susquehanna County Coroner's report, including autopsy photographs and associated materials, and photographs from the accident scene taken on the day of the accident and during a subsequent site inspections.  (Id. at 11).

scenario." (Doc. 118-2, Pl's Br. Ex. 114).  But Benda applies what he calls

the "biomechanical analysis method [that] is well documented in the technical

literature," and cites to a scholarly source.  (Id. at 21, citing Nahum, A. and

Gomez, M., "Injury Reconstruction: The Biomechanical Analysis of Accidental

Injury," Society of Automotive Engineers Technical Paper 940568 (1994)).

Benda summarizes the analysis in three steps:

> 1. From available medical records and other documents, define and
> describe the injuries sustained by Mr. Sherwood and identify the
> mechanisms required to cause such injuries;
> 2. Pose possible fall kinematic scenarios and then, using the known
> data and information of the event, determine those scenarios most
> consistent with the forensic evidence;
> 3. Identify those factors that created or contributed to the injurious
> mechanisms.

(Id.)

Benda then applies this methodology to the evidence gathered from the

sources listed above, and reaches the conclusion that only four plausible

scenarios exist that are "consistent with the information available in this case

and the nature and cause of the injuries Mr. Sherwood sustained[.]"  (Id. at

36).  Plaintiff contends that each of these scenarios would not have occurred

but for the negligence of defendants.

In particular, plaintiff has, and the Lippmann Defendants concede that

she has, presented evidence to connect the purported defects in Lippmann's

crusher to the fall scenarios described in the Benda report.  Plaintiff's experts Jeffrey Lawnicki and Jack Spadaro assert numerous defects that plaintiff alleges were substantial factors in each of the four scenarios Benda delineates.  The Lippmann defendants indicate they intend to challenge plaintiff's experts at the motion in limine stage, but for now assert only that plaintiff cannot establish causation.  We disagree.

Indeed, at this time, none of the defendants contest Benda's methodology, nor challenge his credentials, nor dispute any of the evidence upon which he bases his conclusions.  Instead, defendants urge an empty, conclusory argument that Benda's opinion is speculative, and fail to support that argument with the record.  From reading their briefs, it seems that in defendants' view, only eyewitness testimony of Sherwood's fall would suffice to establish causation, but that assertion alone does not carry defendant's burden.  Thus, we must reject defendants' motions for summary judgement on the issue of causation.

## IV.  Punitive Damages

Next, all defendants move for dismissal of plaintiff's claims for punitive damages.  Defendants argue that plaintiff cannot establish reckless or wanton conduct on the part of defendants, and therefore cannot, as a matter of law,

meet her burden at trial to prevail on a claim for punitive damages.  Again, we

disagree.

The Third Circuit applies Pennsylvania state law regarding punitive

damages:

> The Pennsylvania Supreme Court has held that punitive damages
> may be awarded in negligence cases if the plaintiff proves greater
> culpability than ordinary negligence at trial. In Hutchison, the court
> stated that while a showing of ordinary negligence cannot support a
> punitive damages award, "neither is there anything in law or logic to
> prevent the plaintiff in a case sounding in negligence from
> undertaking the additional burden of attempting to prove . . . that the
> defendant's conduct not only was negligent but that the conduct was
> also outrageous," such that it warrants punitive damages.
> Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., 801 F.3d 347, 358 (3d
> Cir. 2015), quoting Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 773
> (Pa. 2005).

In Pennsylvania, "[t]he state of mind of the actor is vital in determining

whether punitive damages may be awarded. . . . [T]o justify an award of

punitive damages, the fact-finder must determine that the defendant acted

with a culpable state of mind, i.e., with evil motive or reckless indifference to

the rights of others."  Brand Mktg. Grp. LLC, 801 F.3d at 360 (internal quotes

omitted).  Plaintiff does not contend that defendants acted with evil motive, so

the question is whether sufficient evidence exists in the record showing that

defendants acted with reckless indifference such that a punitive damages

claim can withstand summary judgment.

"It takes a special type of recklessness to justify punitive damages in Pennsylvania."  Id.  A punitive damages claim must be supported by evidence sufficient to establish that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."  Id. (quoting Hutchison, 870 A.2d at 772).  "That 'conscious disregard' is critical: an appreciation of the risk is a necessary element of the mental state required for the imposition of [punitive] damages."  Brand Mktg. Grp. LLC, 801 F.3d at 360 (quoting Martin v. Johns-Manville Corp., 494 A.2d 1088, 1097 n.12 (Pa. 1985)).  Thus, for us to grant summary judgment to defendants and dismiss plaintiff's claims for punitive damages, we must find no evidence in the record that defendants actually knew their conduct was placing Sherwood at risk of harm.  We examine the arguments of the B.S. Quarries and Lippmann Defendants in turn.

The B.S. Quarries Defendants argue that plaintiff can supply no such evidence of a subjective appreciation of the risk of harm to which plaintiff was exposed, nor that defendants acted or failed to act in conscious disregard of that risk.  The B.S. Quarries Defendants fail to cite to any facts in the record to support this contention, and merely rely, as in their causation argument, on

35

blanket, conclusory assertions that plaintiff has presented no evidence that can satisfy her burden at trial.

Plaintiff counters that the record does in fact establish that the B.S. Quarries Defendants knew of the risks to which they exposed Sherwood and other workers through their actions, and that they continued with those negligent acts in conscious disregard of those risks.  Plaintiff submits testimony from Mark Baxter to the effect that he and other employees were instructed to clear jams in the crusher in improper and dangerous ways. (Doc. 125-1, Ex. 58, Dep. of Mark Baxter at 99-101).   Baxter testified that he complained about these improper and dangerous practices, which required employees to be located "inside the feeder where we're not supposed to be while the crusher is running," and when he complained he was told to "just shut up."  (Id. at 101).

Baxter further testified that when he complained about unsafe practices to Defendant Thomas Bolles, Safety Coordinator Jay Moleneaux, and a supervisor, Chad Fotusky, he was told, "quote, if you don't like it, you can go find another job, close quotes."  (Id. at 67).  Baxter was required to clear jams without turning off the crusher, instead being told to "keep it running.  Just keep it running, and just jump over the hole.  Get in there and start throwing

the rocks in . . . [a]nd then it will all fall down through." (Id. at 70-71).

Plaintiff continues to cite a mining expert and another deposition, but for our purposes in this analysis, we can stop here. Clearly, viewed in the light most favorable to plaintiff, Baxter's testimony demonstrates that the B.S. Quarries Defendants knew about the unsafe practices that put their employees working on the crusher–including Wesley Sherwood–at risk, and refused to end those practices.[11]  Plaintiff's claims for punitive damages against the B.S. Quarries Defendants, therefore, can be presented to a jury.

The Lippmann Defendants likewise argue that plaintiff has failed to present any evidence to establish that Lippmann knew of the risks its allegedly defective crusher posed and sold it anyway with reckless indifference to those dangers. A review of the record evidence refutes that argument.

Plaintiff claims that the Lippmann Manual was defective, in part, because it did not provide a safe manner in which to clear a jam. Plaintiff

---

[11]  As explained above, the TNT Defendants are owned by Defendants Tim Smith and Thomas Bolles, and therefore, any knowledge of the risks on their part in imputed to the entities they own and operate. Therefore, taken as true, plaintiff's evidence establishes that the TNT Defendants knew of the risks faced by Wesley Sherwood. It is undisputed that the TNT Defendants did not warn Sherwood of those risks, thus plaintiff's claim for punitive damages stands.

argues that a lockout/tagout procedure to clear jams would have prevented Wesley Sherwood's death, but the B.S. Quarries Defendants used a more dangerous method instead.  Plaintiff points to testimony from Lippmann's corporate designee, Jeremy Kerber, as evidence that Lippmann knew of the dangers posed by clearing a jam, knew that a lockout/tagout procedure was the safest way to avoid those dangers, and failed to include that (or any) method to clear jams in the Manual.  (See Doc. 131, Ex. 52, Dep. of Jeremy A. Kerber at 198-99 ("Q - And you agree that despite you knowing the dangers - or Lippmann-Milwaukee knowing the dangers and the safe way to clear jams, it's not specifically addressed in the proper fashion in its operation manual? . . . [A -] The way I described to do it, no, it is not.")).  Kerber went on to acknowledge that a crusher operator should be advised of the lockout/tagout method to clear jams.

This testimony alone establishes that: 1) Lippmann knew that clearing jams in their rock crusher was dangerous; 2) Lippmann knew that a lockout/tagout method of clearing jams is the safest way to clear jams; and 3) Lippmann failed to instruct purchasers of the crusher of the safest method of clearing jams when they ommitted that information from the Manual.  Plaintiff, therefore, has satisfied the evidentiary requirements to put forward a claim for

38

punitive damages against the Lippmann Defendants.

Accordingly, all defendants' motions for summary judgment as to plaintiff's claims for punitive damages will be denied.

## V.   Failure to Warn

We next consider plaintiff's motion for summary judgment urging a finding that Defendant Lippmann's crusher was defective as a matter of law due to an unreasonably dangerous lack of warnings.  Defendant argues that at most, plaintiff's case amounts to a question for the jury.  We agree with defendant.

We first note that in framing their arguments regarding whether the court or the jury should decide the issue of defectiveness, the parties rely in large part on case law predicated upon the Supreme Court of Pennsylvania's decision in Azzarello v. Black Brothers Company, 391 A.2d 1020 (Pa. 1978). The Pennsylvania Supreme Court, however, expressly overruled Azzarello in Tincher v. Omega Flex, 104 A.3d 328, 335 (Pa. 2014), and thus it and its progeny are no longer good law.

Because the Tincher court declined to adopt the Third Restatement of Torts in design defect cases, the law in Pennsylvania states:

Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the

question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. Thus, the trial court is relegated to its traditional role of determining issues of law, e.g., on dispositive motions, and articulating the law for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

Tincher, 104 A.3d at 335.

In a Pennsylvania strict liability case, "a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which 'is expected to and does reach the user or consumer without substantial change in the condition in which it is sold'—free from 'a defective condition unreasonably dangerous to the consumer or [the consumer's] property.'" Id. (citing RESTATEMENT (2d) OF TORTS §402A(1)). "To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" Id. Further, "in Pennsylvania, the cause of action in strict products liability requires proof, in the alternative, either of the ordinary consumer's expectations or of the risk-utility of a product." Id. at 401. "[W]hen a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product." Id. at 407. Likewise, a plaintiff asserting a consumer expectations theory must provide

40

evidence of an ordinary consumer's expectations as to the risks presented by the product.  Id. at 401.

Here, plaintiff has failed to specify either theory of liability set forth in Tincher, and has provided no proof either of the risks and utility of the rock crusher, nor of an ordinary consumer's expectations.  We hold that plaintiff has, thus, failed to carry her burden, and her motion will be denied in this respect.

## VI.    Assumption of Risk and Contributory Negligence[12]

And finally, plaintiff moves for summary judgment on defendants' assertions that Wesley Sherwood voluntarily assumed the risk of harm that caused his death and that Sherwood's own negligence contributed to his

_____

[12] As a preliminary matter, the Lippmann Defendants offer no arguments against plaintiff's motion on this point, other than to assert that because plaintiff's cannot prove causation, the court will never reach the issues of assumption of risk or contributory negligence.  Even if this turns out to be true, plaintiff's claims against the Lippmann Defendants invokes strict liability.  Thus, Pennsylvania law would bar any attempt by the Lippmann Defendants, under a comparative negligence theory, to introduce evidence of Sherwood's negligence in operating the rock crusher in order to limit its own liability.  Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 348 (3d Cir. 2000) (citing Frey v. Harley Davidson Motor Co., 1999 734 A.2d 1, 10 (Pa. Super. Ct. 1999) ("The general rule [is] that contributory and comparative negligence are not defenses to a strict products liability action."), appeal denied, 751 A.2d 191 (Pa. 2000)); Jara v. Rexworks, Inc., 718 A.2d 788, 793 (Pa. Super. Ct. 1998).

death.

Plaintiff argues that Pennsylvania law precludes the defense of assumption of risk where an employee is injured by an allegedly defective product.  None of the defendants provide a counterargument to this statement of Pennsylvania law.  The B.S. Quarries Defendants argue, essentially, that plaintiff has not proven that Sherwood did not assume the risk of harm from falling into the crusher, an open and obvious danger.  Even if we accept that the crusher posed an obvious danger such that any layperson would have appreciated the risks it presented, defendants offer no evidence that Sherwood's actions were voluntary.  Plaintiff argues that under Pennsylvania law, because Sherwood died in the course of his employment on a machine he was directed by his employer to operate, there can be no proof of voluntariness as a matter of law.

The defense of assumption of risk requires that the defendant prove that a plaintiff "fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels," and that that plaintiff "nevertheless voluntarily chooses to enter or remain . . . under circumstances that manifest his willingness to accept it." RESTATEMENT (SECOND) OF TORTS § 496C; see also Rutter v. Ne. Beaver Cty.

Sch. Dist., et al., 437 A.2d 1198 (Pa. 1981).

"Where an employee, in doing a job, is required to use equipment as furnished by the employer, this defense [of assumption of risk] is unavailable." Jara, 718 A.2d at 795.  "An employee who is required to use certain equipment in the course of his employment and who uses that equipment as directed by the employer has no choice in encountering a risk inherent in that equipment."  Id.

As the Third Circuit Court of Appeals recognized in D'Angelo v. Ads Machinery Corporation, 128 F. App'x 253, 256 (3d Cir. 2005), the Jara rule only applies when the employee used the equipment in question "as directed by [his] employer."  As discussed below in section IV, genuine issues of material fact exist with respect to what Sherwood was doing at the time he fell into the crusher.  We cannot, therefore, take the question of assumption of risk out of the hands of the jury.

Following the same reasoning, we cannot grant summary judgment on the issue of contributory negligence either.  Plaintiff's own expert opines that one of the four possible scenarios that could have caused Sherwood's death involved Sherwood sitting on a railing and accidentally falling off.  This alone creates an issue of material fact sufficient for the jury to consider the question

43

of contributory negligence as well.

We will, therefore, deny plaintiff's motion regarding assumption of risk and contributory negligence.

**Conclusion**

To summarize, we will grant summary judgment in favor of plaintiff and pierce the corporate veil, and we hold that B.S. Quarries and Damascus 535 are alter egos for Thomas Bolles and Timothy Smith; we will grant summary judgment in favor of plaintiff to the extent that the B.S. Quarries Defendants are estopped from invoking employer immunity under Pennsylvania workers' compensation law; we will grant summary judgment in favor of Defendant TNT Services, Corp., who will be dismissed from this case; we will deny all remaining aspects of the parties' motions for summary judgment. Accordingly, the following claims remain in the case: 1) Count I, negligence against the remaining B.S. Quarries Defendants; 2) Count II, products liability against the Lippmann Defendants; 3) Count III, wrongful death against all defendants; 4) Count IV, survival action against all defendants and; 5) Count V, punitive damages against all defendants.   An appropriate order follows.

**DATE:3/31/16**                              **s/ James M. Munley**
                                              **JUDGE JAMES M. MUNLEY**
                                              **United States District Court**

44